UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LORENZO SLAPPEY,

        Plaintiff,

                              CASE NO. 07-CV-11185-DT
                              JUDGE GERALD E. ROSEN
                              MAGISTRATE JUDGE PAUL J. KOMIVES

  v.

PATRICIA CARUSO,
DENNIS STRAUB,
BLAINE LAFLER and
STEVE RIVARD,

        Defendants.

_____/

**REPORT AND RECOMMENDATION REGARDING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. Ent. 16)**

Table of Contents

I.     **RECOMMENDATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    **REPORT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
     A.     **Plaintiff Has Tested Positive for Helicobacter Pylori.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
     B.     **He Filed an MDOC Grievance and Appealed It to Step III.** . . . . . . . . . . . . . . . . . . . . . . . . . **6**
     C.     **He Then Filed a 42 U.S.C. § 1983 Complaint Based Upon the Eighth Amendment.** . . . . . . . **7**
     D.     **Defendants' Have Filed a Motion for Summary Judgment.** . . . . . . . . . . . . . . . . . . . . . . . . . **8**
     E.     **Fed. R. Civ. P. 56 ("Summary Judgment")** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**
     F.     **The Court Should Grant Defendants' Dispositive Motion.** . . . . . . . . . . . . . . . . . . . . . . . . . **12**
           1.     **The Eleventh Amendment bars some of plaintiff's claims.** . . . . . . . . . . . . . . . . . . . **12**
           2.     **Plaintiff's claims do not satisfy the subjective component of an Eighth Amendment
                 claim.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**
           3.     **Plaintiff's claims are governed by the Eighth Amendment and not substantive due
                 process under the Fourteenth Amendment.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**
           4.     **Plaintiff's claims are based upon the doctrine of respondeat superior, and there is no
                 showing that defendants are personally involved as defined by 42 U.S.C. § 1983.**
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**
           5.     **Therefore, the Court need not consider whether plaintiff's rights were clearly
                 established or whether defendants' conduct was objectively reasonable.** . . . . . . . **37**

III.    **NOTICE TO PARTIES REGARDING OBJECTIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **40**

I.    **RECOMMENDATION:**  The Court should grant defendants' motion for summary

judgment.  Doc. Ent. 16.

II.   **REPORT:**

A.    **Plaintiff Has Tested Positive for Helicobacter Pylori.**

1.    By way of background, plaintiff claims that the Environmental Protection Agency (EPA)

found elevated levels of dichloro-diphenyl-trichloroethane (DDT), a pesticide,[1] in the Pine River

in 1997 and began an investigation.  Doc. Etn. 1 at 12 ¶ 38.  According to plaintiff, the

government began investigating the Michigan Chemical/Velsicol Chemical plant in St. Louis,

Michigan, in 2001.  Doc. Et. 1 at 12 ¶¶ 32-33, 40.

Helicobacter pylori (H Pylori) was a subject of the St. Louis Correctional Facility (SLF)

Warden's November 16, 2001, Forum Meeting.  Doc. Ent. 3 at 39-40; Doc. Ent. 16-4.  The

response to concerns that a few prisoners had been diagnosed with H Pylori was, in part, as

follows:

> According to the information presented by the prisoners and the information
> obtained from medical reference books and the Public Health Department - the
> method of transmission of H. Pylori is unknown[.] [H]owever, because of the
> parts of the body where it has been recovered[,] it is believed the transmission is
> by mouth.  It has been isolated in saliva which could mean that it can be passed
> by kissing.  Routes of transmission are being studied by the CDC (Centers of
> Disease Control and Prevention).
>
> The water consumed by SLF is provided by the City of St. Louis.  The city is
> responsible for conducting tests.  H. Pylori is a bacteria that is not identified by
> the State Department of Environmental Quality as a bacteria that needs to be
> screened for in the monthly tests.  According to the Environmental Protection
> Agency . . . there is no suitable method currently available to test for H. Pylori in
> drinking water.

---

[1]http://www.epa.gov/pesticides/factsheets/chemicals/ddt-brief-history-status.htm.

> Of the two prisoners cited by the forum, one was tested for H. Pylori and was negative. The other prisoner has not been tested.
>
> There is no indication at this time for a need for extensive testing of prisoners for H. Pylori. If a prisoner presents to health care with symptoms suggestive of H. Pylori, that prisoner will be tested. If positive, that prisoner will be treated.

Doc. Ent. 3 at 39-40. *See also* Doc. Ent. 1 at 14 ¶ 43.

Helicobacter pylori (H Pylori) was also a subject of the St. Louis Correctional Facility (SLF) Warden's December 20, 2002, Forum Meeting. The minutes state that "[s]everal prisoners here at SLF have recently tested positive for [H Pylori]." The response was that "[a] few prisoners have tested positive in the last two months. There is no reason to believe they were exposed at SLF. Prisoners need to stop self-diagnosing themselves. Accurate symptoms need to be provided on Health Care kites." Doc. Ent. 29-3 at 30-36.

According to plaintiff, in 2004 the EPA found "low levels of a DDT-making by product in three City wells[.]" Doc. Ent. 1 at 12 ¶ 41. In 2005, DDT's presence was confirmed and "the EPA [told] the City about the contamination[.]" Doc. Ent. 1 at 14 ¶ 42.[2] According to an October 10, 2005, MDOC Memorandum from Wardens Blaine Lafler and Percy Conerly regarding the City of St. Louis Water Supply:

> The City of St. Louis Mayor's Office has notified the St. Louis Correctional Facilities that the chemical para-chlorobenzene sulfonic acid (P-CBSA)[[3]] was found in a low concentration in three of the cities six water wells that supply the municipal drinking water system. The three St. Louis Correctional Facilities are connected to the St. Louis Municipal water supply.

--------

[2]Plaintiff's "History of Contamination" section appears to have been derived from a November 14, 2005, Detroit News article. Doc. Ent. 1 at 12, 14 ¶¶ 32-42, Doc. Ent. 3 at 37-38.

[3]According to defendants, p-CBSA "is a by-product of the chemical DDT." Doc. Ent. 16 at 10 n.12.

The Michigan Department of Environmental Quality (DEQ) has informed MDOC that based on a U.S. Environmental Protection Agency (EPA) assessment, the concentration of p-CBSA found in the water supply is far below the concentration believed to cause adverse effects on humans. As a precaution, the city is limiting the use of two affected wells. The DEQ is also continuing to collect and evaluate information to assess health risks and to determine the best operational practices for the St. Louis water system.

The DEQ does not recommend any special precautions be taken, nor are any necessary for use of the water supply at this time. Based on these directions, use of the St. Louis municipal water supply will continue. We will stay in contact with the City of St. Louis and the DEQ, and will inform you of new information, if and when it becomes available.

Doc. Ent. 16-5 at 2. On October 20, 2005, the DEQ wrote to the City of St. Louis regarding p-CBSA in well numbers 1, 4, and 7. The Department asked the City acknowledged that "the concentrations of pCBSA detected in the wells are far below the projected toxic level," but "asked the City to minimize the use of Wells #1, #4 and #7[.]" Furthermore, the Department was "very concerned about the potential for future contamination of the City's wells[,]" and strongly recommended "that the City investigate alternative sources of water as soon as possible." *See Rouse v. Caruso*, Case No. 06-CV-10961-PVG-PJK, Doc. Ent. 14-3 at 28.

On or about July 9, 2007, the City of St. Louis filed a lawsuit against Velsicol Chemical Corporation, as well as other defendants, in Gratiot County Circuit Court. Case No. 07-10385 CE. The complaint is based upon (I) Michigan Natural Resources Environmental Protection Act; (II) nuisance, (III) trespass; (IV) negligence and (V) declaratory relief. Among the requests for relief are "an order declaring that defendants are liable for the full costs of all future investigation, treatment, remediation and monitoring costs and expenses related to the p-CBSA contamination and threat of further contamination of Plaintiff's Water System[.]" Case No. 07-

CV-13683-TLL-CEB (Doc. Ent. 1 at 39). The complaint was removed to this Court on August 31, 2007.

On September 24, 2007, the U. S. EPA issued its third five-year review report for the Velsicol Chemical Corporation Site in St. Louis, Michigan. The executive summary states, in part, that "[t]he assessment of this five-year review found that the site as a whole is not protective of human health and the environment."[4]

**2.** On June 21, 2006, Sgt. A. Ellison sought health care assistance for plaintiff, because plaintiff was having difficulty breathing and felt dizzy, nauseous and cold. Doc. Ent. 3 at 2. Plaintiff also had "excruciating stomach pain[.]" Doc. Ent. 1 at 9 ¶ 22. Plaintiff was sent to Gratiot Medical Center. Doc. Ent. 1 at 10 ¶ 23, Doc. Ent. 3 at 4. The clinical impression was gastroesophageal reflux disease (GERD). Doc. Ent. 3 at 6-7. Plaintiff was given a gastrointestinal cocktail and Nexium. Doc. Ent. 3 at 9. Tests were performed. Doc. Ent. 3 at 10-11. He was discharged, with the instruction, "Please try to get Nexium for patient. Prilosec not effective[.]" Doc. Ent. 3 at 12. *See also* Doc. Ent. 1 at 10 ¶ 24. Dr. Nabeel A. Mohamed of SLF sought to get Prevacid for plaintiff, because Prilosec was not working, and ordered an (HPIG) H PYLORI AB, IGG test. Doc. Ent. 3 at 14-15. *See also* Doc. Ent. 1 at 10 ¶ 25.

On June 26, 2006, Haresh Pandya, MD, Regional Medical Officer (RMO), denied the request for Prevacid and directed that plaintiff take Prilosec at certain times. Doc. Ent. 1 at 11 ¶ 27, Doc. Ent. 3 at 21. On June 26, 2006, Pandya ordered a comprehensive profile, a CBC and a

_____

[4]www.epa.gov/region5/superfund/fiveyear/reviews_pdf/michigan/velsicol_chemical_2007_fyr_ mi.pdf. According to page fifteen of this report, the first and second five year reviews were performed on August 27, 1997, and September 25, 2002, respectively.

Westergren Sedimentation Rate. Doc. Ent. 3 at 19. *See also* Doc. Ent. 1 at 10 ¶ 26. On June 28, 2006, Vicki L. Curtice, RT, sent several tests, including an H PYLORI AB, IGG, to an off-site lab. Doc. Ent. 3 at 18. On June 30, 2006, Curtice sent a stool sample to an off-site lab to be tested for occult blood. Doc. Ent. 3 at 17. Plaintiff tested positive for H PYLORI IGG and negative for STOOL FOR OCCULT BLOOD. Doc. Ent. E at 23-25.[5]

On July 6, 2006, a health care nurse informed plaintiff that he had tested positive for H Pylori and would received medication. Doc. Ent. 1 at 11 ¶ 28. Plaintiff received a copy of his lab results on August 14, 2006. Doc. Ent. 1 at 11 ¶ 29.

## B.    He Filed an MDOC Grievance and Appealed It to Step III.

On September 20, 2006, plaintiff completed a Step I grievance form in which he claims that MDOC failed to protect him from "KNOWN, harmful and potential cancer causing bacterial contaminant in the water." SLF-06-09-1665-28g. In the grievance, he identifies Patricia Caruso, Director of the Michigan Department of Corrections (MDOC); Dennis Straub, described as the MDOC Deputy Director; Blaine Lafler, the SLF Warden, and Steve Rivard, described as SLF's Deputy Warden. Doc. Ent. 3 at 27-28. *See also* Doc. Ent. 1 at 11 ¶ 30. The grievance was received at Step I on September 22, 2006, and was rejected by SLF Grievance Coordinator K. Sheets based upon lack of jurisdiction. Doc. Ent. 3 at 30.

---

[5]It is not clear when plaintiff began his incarceration at SLF. The Court knows only that (1) he is incarcerated for a violation of Mich. Comp. Laws § 750.520b (Criminal sexual conduct in the first degree) with an earliest release date of August 5, 2015, *see* www.michigan.gov/corrections, "Offender Search[,]" and (2) plaintiff filed a petition for writ of habeas corpus on August 14, 1991, Case No. 91-73977.

Nonetheless, it is clear that plaintiff contends that he contracted H Pylori from the water at SLF. Doc. Ent. 25 at 10. Therefore, this report assumes *arguendo* that plaintiff contracted H Pylori while incarcerated at SLF.

On September 29, 2006, plaintiff completed a Step II grievance appeal form. Plaintiff alleged that "[r]ejection of [his] step-1 grievance [wa]s a[n] issue of deliberate indifference." Again, he specifically identified Caruso, Straub, Lafler and Rivard. Doc. Ent. 3 at 31. The Step II grievance appeal was received by Warden Lafler on October 5, 2006. Doc. Ent. 3 at 33. Plaintiff alleges that Warden Lafler did not timely respond to the Step II appeal. Doc. Ent. 3 at 34.

On October 27, 2006, plaintiff completed a Step III grievance appeal. Doc. Ent. 1 at 11 ¶ 31, Doc. Ent. 3 at 34. Jim Armstrong denied the grievance appeal on November 13, 2006. Doc. Ent. 3 at 35.

## C.     He Then Filed a 42 U.S.C. § 1983 Complaint Based Upon the Eighth Amendment.[6]

On February 26, 2007, plaintiff saw Nadeem Ullah, M.D., at the Duane L. .Waters Health Center (DWH), because plaintiff's GERD was not responding to treatment. Ullah agreed that "we should do an EGD for further evaluation to rule out any other GI lesion accounting for these symptoms, especially when he has lost some weight as well." Doc. Ent. 29-3 at 39-40. CMS approved the procedure on March 11, 2007, and it was scheduled for April 23, 2007. Doc. Ent. 29-3 at 43-44. On April 23, 2007, Ullah performed an EGD with biopsy. Plaintiff's post-operative diagnosis was gastric erosions. Among Ullah's recommendations were to treat

---

[6]There have been other cases in this district which have concerned St. Louis water. *Sueing v. Blanchard*, Case No. 90-10224 (Cleland, J.) (9/23/2004 judgment for defendants against plaintiffs); *Nali v. Michigan Department of Corrections*, Case No. 06-10205 (Cohn, J.) (2/4/08 order granting the City of St. Louis's motion to dismiss and dismissing plaintiff's claims against certain defendants) and *Rouse v. Caruso*, Case No. 06-10961 (Gadola, J.).

plaintiff for H Pylori if his biopsies were positive for it and to increase Prilosec to 20 mg twice a day. Doc. Ent. 29-3 at 41-42.[7]

On March 20, 2007, after plaintiff's procedure was approved but before it was performed, plaintiff filed this pro se, verified prisoner civil rights complaint against Caruso, Straub, Lafler and Rivard based upon 42 U.S.C. § 1983 and the Eighth Amendment to the United States Constitution. Doc. Ent. 1 at 1 ¶ 1, Doc. Ent. 1 at 16.[8] He alleges that defendants have subjected him to the consumption of "'known' contaminated water and the food that's prepared in this 'toxic/bacteria['] water here at [SLF][.]" Doc. Ent. 1 at 5 ¶ 7. He seeks several million dollars in future, compensatory, actual and punitive damages. Doc. Ent. 1 at 13 ¶¶ 48-51. He also seeks fees and costs. Doc. Ent. 1 at 15. Plaintiff is currently incarcerated at Lakeland Correctional Facility (LCF) in Coldwater, Michigan.[9]

**D. Defendants' Have Filed a Motion for Summary Judgment.**

On June 20, 2007, defendants filed a motion for summary judgment, setting forth three arguments: (1) "Eleventh Amendment immunity bars official capacity claims and the immunity cannot be abrogated absent a showing of a continuing violation of federal law;" (2) "[q]ualified immunity bars individual capacity claims and the immunity cannot be avoided absent a showing of a violation of clearly established federal rights;" and (3) "[p]laintiff avers that he contracted and was treated for H-Pylori and bases his claims on theories of deliberate indifference and

---

[7]Plaintiff has also provided copies of the April 23rd anesthetic record, post-anesthesia care, nurses' operating room record, and medical history & physical examination. Doc. Ent. 29-3 at 45-49.

[8]Plaintiff also filed several exhibits. Doc. Ent. 3.

[9]*See* www.michigan.gov/corrections, "Offender Search."

supervisory liability." Doc. Ent. 16 at 4. Defendants ask that the Court grant their motion and dismiss this case with prejudice. Doc. Ent. 16 at 12.

On August 3, 2007, plaintiff filed a verified statement of disputed factual issues. Doc. Ent. 28. On the same day, he filed a verified response in which he argues:

I. [He] has standing pursuant to 42 U.S.C. § 1983, to file a civil suit against all four (4) defendants, who are state officials acting under the color of law, making this federal court the proper forum for plaintiff to raise claims of violations of constitutional rights.

II. [He] was/is entitled to the 'liberal notice pleading' in regards to his initial 'complaint', filed in this civil suit litigation.[10]

III. [He] has shown that defendants, did not only violate [his] Eighth Amendment right to cruel and unusual punishment, by placing plaintiff at [SLF], where it was clearly known to [them] beforehand that the 'water' at this prison was toxic/bacterial/contaminated due to numerous inmates here, being 'infected' with the disease 'H-Pylori', and filing grievances, complaints, and lawsuits in this regard, and that defendants were deliberate[ly] indifferen[t], to the safety and well-being of plaintiff, by placing him against his will in a prison facility with tainted water, which has le[d] to plaintiff being infected with the disease H-Pylori.

IV. [He] states that all four (4) defendant(s), are not entitled to the defense of qualified immunity, where: (1) plaintiff's constitutional rights have been violated; and (2) the constitutional rights were clearly established at the time of violation.

V. [His] constitutional claims against all four (4) defendants, can surpass the respondeat superior barrier, to show § 1983 liability, where defendant[s] in their supervisory capacity, encouraged, the specific misconduct and/or directly participated in it, by their implicitly, authorized, approved or knowingly acquiesced the unconstitutional conduct of the offending subordinate.

VI. Defendant[s] are not entitled to summary judgment, due to the fact that there is a genuine issue as to several material fact(s), in the present cause, when drawing all reasonable inferences in favor of plaintiff, who is the non-moving party, regarding summary judgment.

---

[10]Plaintiff asks the Court "to use the liberal notice pleading requirement and to read the complaint indulgently." Doc. Ent. 25 at 13. "[T]he allegations of the pro se complaint [are held] to less stringent standards than formal pleadings drafted by lawyers[.]" *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

VII.    [He] should be given additional time, until [he] receives all 'discovery materials/documents' requested, prior to this Court ruling upon defendant[s] motion for summary judgment, in order for plaintiff to be given an opportunity to defeat the defendant[s] motion for summary judgment.

Doc. Ent. 25 at 10-24.[11]  Plaintiff also filed appendices A-I.  Doc. Ent. 29.[12]

**E.      Fed. R. Civ. P. 56 ("Summary Judgment")**

Summary judgment, pursuant to Fed. R. Civ. P. 56, may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties.

---

[11]Plaintiff states that my July 11, 2007, order setting his response deadline for August 3, 2007 (Doc. Ent. 20), did not acknowledge his previously filed motion for an extension to August 11, 2007 (Doc. Ent. 19).  Doc. Ent. 25 at 6 ¶ 5.  However, I note that plaintiff filed another motion for extension on July 23, 2007 (Doc. Ent. 21), and I granted that motion on August 1, 2007, setting the response deadline for October 3, 2007 (Doc. Ent. 22)

[12]For the most part, these appear to consist of Docket Entries 1, 3, 18, 16, 19, 20.  Doc. Ent. 29 at 1-50, Doc. Ent. 29-2 at 1-50 and Doc. Ent. 29-3 at 1-3.

However, four of these appendices appear to be new to the record.  **Appendix F** concerns John Joseph Shulick's (#447749) kite response and affidavit, as well as the lab results and affidavit of another prisoner who tested positive for H PYLORI IGG in October 2006.  Doc. Ent. 29-3 at 4-12.  **Appendix G** is information on the treatment of gastric and duodenal ulcers, as well as a 2004 Water Quality Data report and several DEQ Drinking Water Laboratory Official Laboratory Reports on analysis for coliform organisms, dated 2005-2007, each of which states "not detected".  Doc. Ent. 29-3 at 13-28.  **Appendix H** consists of copies of portions of MDOC PD 04.01.150 ("Prisoner Housing Unit Representatives/Warden's Forum"), effective January 1, 2001; portions of the November 16, 2001, SLF Warden's Forum Meeting Minutes and portions of the December 20, 2002, SLF Warden's Forum Meeting Minutes.  Doc. Ent. 29-3 at 29-36.  **Appendix I** contains plaintiff's medical records.  Doc. Ent. 29-3 at 37-49.

*Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citing *Johnson v. Soulis,* 542 P.2d 867,

872 (Wyo. 1975) (quoting BLACK'S LAW DICTIONARY 881 (6th ed.1979)).  "In evaluating a

motion for summary judgment we view all evidence in the light most favorable to Plaintiff . . .

and assess the proof to determine whether there is a genuine need for trial."  *Gantt v. Wilson*

*Sporting Goods Co.*, 143 F.3d 1042, 1045 (6th Cir. 1998) (citations omitted).[13]

The movant bears the burden of demonstrating the absence of all genuine issues of

material fact.  *See Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986).  The moving

party need not produce evidence showing the absence of a genuine issue of material fact.

Rather, "the burden on the moving party may be discharged by 'showing' – that is, pointing out

to the district court – that there is an absence of evidence to support the non-moving party's

case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party discharges

that burden, the burden shifts to the non-moving party to set forth specific facts showing a

genuine triable issue.  Fed. R. Civ. P. 56(e); *Gregg*, 801 F.2d at 861.

"Although the nonmoving party 'may not rest upon the mere allegations or denials' of his

pleading, Fed. R. Civ. P. 56(e), a verified complaint . . . satisfies the burden of the nonmovant to

respond." *Thaddeus-X v. Blatter*, 175 F.3d 378, 385 (6th Cir. 1999).[14]  "[A] verified complaint . .

. would have the same force and effect as an affidavit and would give rise to genuine issues of

material fact."  *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992).  However, "[s]upporting

and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would

---

[13]The Sixth Circuit cited both *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and
*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) in support of this
statement.

[14]Plaintiff signed his complaint under penalty of perjury.  *See* Doc. Ent. 1 at 16 ¶ 55; 25
U.S.C. § 1746 ("Unsworn declarations under penalty of perjury").

be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). *See also Hamilton v. Roberts*, No. 97-1696, 1998 WL 639158, *5 (6th Cir. Sept. 10, 1998) (unpublished) (personal knowledge required); *Daniel v. Cox*, No. 96-5283, 1997 WL 234615, *2 (6th Cir. May 6, 1997) (unpublished) (conclusory assertions are insufficient for purposes of surviving summary judgment); *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (citing *Daily Press, Inc. v. United Press Int'l*, 412 F.2d 126, 133 (6th Cir. 1969)) (cannot consider hearsay evidence).

"Demonstration of simply 'metaphysical doubt as to the material facts' is insufficient." *Kand Medical, Inc. v. Freund Medical Products, Inc.*, 963 F.2d 125, 127 (6th Cir. 1992), citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 246-250 (citations omitted); *see Celotex Corp.*, 477 U.S. at 322-23; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986). The standard for summary judgment mirrors the standard for a directed verdict under Fed. R. Civ. P. 50(a). *Anderson*, 477 U.S. at 250. Consequently, a non-movant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact.

**F.      The Court Should Grant Defendants' Dispositive Motion.**

**1.      The Eleventh Amendment bars some of plaintiff's claims.**

**a.**     Plaintiff sues defendants in their personal and official capacities.  Doc. Ent. 1 at 1; Doc. Ent. 1 at 8 ¶ 19.  As previously noted, plaintiff seeks several million dollars in future, compensatory, actual and punitive damages.  Doc. Ent. 1 at 13 ¶¶ 48-51.  He also seeks injunctive relief.  Doc. Ent. 1 at 6 ¶ 12, 15 ¶ 52.  *See also* Doc. Ent. 25 at 9 ¶ A.

Defendants argue that "[o]fficial capacity claims are barred by Eleventh Amendment immunity since the State of Michigan has not waived its immunity for purposes of suit under 42 USC § 1983, and the absence of a showing of a continuing violation of federal law precludes abrogation of that immunity."  Doc. Ent. 16 at 2.  Defendants argue that "there are no facts warranting the abrogation of Eleventh Amendment immunity[.]" Doc. Ent. 16 at 9.

**b.**     The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI.  Although the amendment expressly prohibits only suits against states by citizens of other states, the Supreme Court has long held that the Eleventh Amendment also bars suits by citizens of the state being sued.  *See Hans v. Louisiana*, 134 U.S. 1 (1890); *Welch v. Texas Dep't of Highways and Public Transp.*, 483 U.S. 468, 472-73 (1987) (plurality opinion). "[I]n the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *see also, Papasan v. Allain*, 478 U.S. 265, 276 (1986).

As the Supreme Court made clear in *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989), Section 1983 "does not provide a federal forum for litigants who seek a remedy against a

State for alleged deprivations of civil liberties.  The Eleventh Amendment bars such suits unless the State has waived its immunity, or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity." *Will*, 491 U.S. at 66 (internal citations omitted).  The Eleventh Amendment bars suits against state officials sued in their official capacity.  *Will*, 491 U.S. at 71.  *See also*, *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985).

Here, the MDOC defendants are state officials, and plaintiff's claims against them in their official capacities are therefore barred by the Eleventh Amendment.  However, plaintiff may seek injunctive relief from a state official sued in his or her official capacity.  *Will*, *supra*, 491 U.S. at 71 n. 10.

**c.**     There is a limited exception to the Eleventh Amendment bar for suits against state officers in their official capacities which seek only prospective relief.  To come within this exception, the relief sought by the plaintiff must (1) remedy a continuing violation of federal law; and (2) properly be characterized as prospective.  *See Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002); *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 73 (1996).

Plaintiff argues that he "has shown a continuing violation of the Constitution."  Plaintiff alleges that defendants owe him "a duty of care to supply [him] with the most basic human needs, such as food, water, shelter, clothing, and medical care[,]" and "surely poisonous water does not fall into the category of providing plaintiff the basic human needs, while under defendant's care, when plaintiff is incarcerated against his will."  Plaintiff argues that "surely the continuing forcing of plaintiff to drink 'poisonous water', falls under the exception which trumps

14

the Eleventh Amendment immunity defense, especially considering that plaintiff continues to suffer irreparable harm/injury, on a daily basis, by being forced to live in []continued excruciating pain[.]" Doc. Ent. 28 at 3 ¶ 4. As plaintiff points out, he has sought injunctive relief, and "claims for prospective injunctive relief brought against individual defendants in their official capacities are not necessarily barred by the Eleventh Amendment." *Bailey v. Montgomery*, 433 F.Supp.2d 806, 810 (E. D. Ky. 2006); Doc. Ent. 28 at 3 ¶ 4.

Plaintiff claims that defendants "continue to leave [him] in excruciating daily pain", because H Pylori "has [wreaked] complete havoc on [him] body, causing vomiting on a daily basis and unimaginable pain and suffering, where defendants continue with callous indifference by refusing to transfer [him] away from this [poison-]laden water which [he] is forced to drink on a daily basis[,]" and the food that is prepared with it. Doc. Ent. 25 at 2-3. Plaintiff also complains of cramps, nausea, headaches and fatigue. Doc. Ent. 25 at 5. He claims he "continues to suffer irreparable injury/harm every day h[e] is continually forced to drink this toxic/bacterial/contaminated water[,]" and "[d]ue to the fact that [he] has not been transferred as to date, his request for injunctive relief is still viable." Doc. Ent. 25 at 21. Plaintiff claims that his request for injunctive relief (in the form of a temporary restraining order and/or a preliminary/permanent injunction) is still viable/cognizable, because he continues to suffer irreparable injury/harm. Doc. Ent. 25 at 22.

Plaintiff's claims against the MDOC defendants in their official capacities to the extent they seek the injunctive relief of transfer are not barred by the Eleventh Amendment. However, plaintiff has since been transferred from SLF. Furthermore, his request for permanent injunctive relief is discussed in the companion report and recommendation.

**d.**     Plaintiff may sue defendants for damages in their personal capacities, because 'state officials, sued in their individual capacities, are 'persons' within the meaning of § 1983.  The Eleventh Amendment does not bar such suits, nor are state officers absolutely immune from personal liability under § 1983 solely by virtue of the 'official' nature of their acts." *Hafer v. Melo*, 502 U.S. 21, 31 (1991).  For the foregoing reasons, the Court should only consider the claims against defendants insofar as they are sued in their personal capacities to the extent that plaintiff seeks monetary damages.

**2.     Plaintiff's claims do not satisfy the subjective component of an Eighth Amendment claim.**

**a.**     Among plaintiff's Eighth Amendment causes of action are the failure to protect him from SLF's known to be contaminated water; the cruel and unusual punishment of subjecting him to consumption of the known to be contaminated water and food prepared in the contaminated water; and deliberate indifference to the known, substantial risk of serious present and future harm to him.  Doc. Ent. 1 at 6 ¶¶ 8-11, 13 ¶¶ 44-47.  Plaintiff contends that the lab results confirm that he contracted H Pylori "from consumption of the water at [SLF][.]" Doc. Ent. 1 at 11 ¶ 29.  Citing the November 16, 2001, Warden's Forum Meeting Minutes, plaintiff claims that "prisoner officials subjectively disregarded an excessive and substantial risk of serious harm to inmates['] present and future health and safety by placing the burden on the City of St. Louis to protect M.D.O.C. [inmates] from a high probability of contracting H-pylori[.]" Doc. Ent. 1 at 14 ¶ 43.

Defendants argue that "[t]he facts do not support a claim of deliberate indifference." Doc. Ent. 16 at 2, 12.  Specifically, defendants argue that "[t]here is no showing of a federal law violation since the facts fail to demonstrate that the defendants exhibited deliberate indifference

to a threat of harm to Plaintiff's health[.]"  Defendants argue that there is "no showing of deliberate indifference to a serious medical need[.]" Doc. Ent. 16 at 9.

**b.** The Constitution "does not mandate comfortable prisons."  *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981).  On the other hand, it does not permit inhumane ones, and it is clear that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  *Helling v. McKinney*, 509 U.S. 25, 31 (1993); *see also, Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  The amendment imposes affirmative duties on prison officials,

> who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must "take reasonable measures to guarantee the safety of the inmates."

*Id*. (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

If the offending conduct is not a criminal penalty, then it must reflect an "'unnecessary and wanton infliction of pain'" to come within Eighth Amendment's prohibition on cruel and unusual punishment.  *Ingraham v. Wright*, 430 U.S. 651, 670 (1977) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  Such claims must satisfy both an objective and a subjective test. *Farmer*, 511 U.S. at 834; *Wilson v. Seiter*, 501 U.S. 294, 297-300 (1991).  Under this analysis, what constitutes "unnecessary and wanton infliction of pain" will vary depending on the nature of the alleged constitutional violation.  *Hudson v. McMillian*, 503 U.S. 1, 5 (1992); *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994).  The plaintiff bears the burden of proving these elements by a preponderance of the evidence.  *Brooks*, 39 F.3d at 127-28.

The objective prong asks whether the harm inflicted by the conduct is sufficiently serious to warrant Eighth Amendment protection.  *McMillian*, 503 U.S. at 8-9; *Rhodes*, 452 U.S. at 349

(1981).  To satisfy this prong, the conduct must deprive the plaintiff of "the minimal civilized measure of life's necessities."  *Rhodes*, 452 U.S. at 349.  The objective component is contextually driven and is responsive to "'contemporary standards of decency.'"  *McMillian*, 503 U.S. at 8 (quoting *Estelle*, 429 U.S. at 103).

The subjective prong asks whether the officials acted with a sufficiently culpable state of mind; that is, was the conduct "wanton."  *Wilson*, 501 U.S. at 302; *Moore v. Holbrook*, 2 F.3d 697, 700 (6th Cir. 1993).  In determining whether an official acted wantonly, the court applies a "deliberate indifference" standard.  *Wilson*, 501 U.S. at 302-03; *see Estelle*, 429 U.S. at 104-06.  Under this "deliberate indifference" standard,

> a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.

*Farmer*, 511 U.S. at 847.

However, the official cannot be liable for risk of which he is unaware.  *Id*. at 837.  An "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference."  *Id*.  A prison official is not free to ignore obvious dangers to inmates, and may be liable even if he does not know the exact nature of the harm that may befall a particular inmate.  *Id*. at 843-44.  However, prison officials may escape liability if they show that they in fact did not know of the obvious risk to the inmate's health or safety, or knowing of it, they acted reasonably under the circumstances.  *Id*. at 844-45.

**c.**     In his response, plaintiff argues that defendants cannot claim they do not know about the water at SLF, STF and SPR, because "numerous inmates have not only become infected with the

disease H-Pylori since being held in [these facilities], but many inmates have filed complaints, grievances, and civil litigation regarding the water." Doc. Ent. 25 at 3. He claims that defendants "knew of and purposely disregarded the tainted water by previously filed complaints, grievances, warden forum meetings and other civil litigation[.]" Doc. Ent. 25 at 5. Plaintiff also claims that MDOC PD 04.01.150 ("Prisoner Housing Unit Representatives/Warden's Forum") "shows how specific institutional problems noted at Warden Forum Meetings go all the way up the chain of command to the M.D.O.C. director's attention." Doc. Ent. 25 at 7 ¶ 8. Plaintiff asks that the court order the St. Louis Correctional Facilities' water to be tested as an offer of proof that he contracted H Pylori from constant consumption of the water and food at SLF. Doc. Ent. 1 at 7 ¶ 14C; Doc. Ent. 1 at 15 ¶ 54C. *See also* Doc. Ent. 25 at 9 ¶ C. Relying on *J.P. v. Taft*, 439 F.Supp.2d 793, 809-812 (S. D. Ohio 2006), plaintiff contends that "if prison officials can be found by the jury to draw the reasonable inference that a plaintiff suffered from the wanton infliction of unnecessary . . . pain regarding the violation of the Eighth Amendment deliberate indifference for failure to provide personal hygiene items . . . as well as access to adequate toilet facilities," then so could a jury in this case, because the everyday need for untainted water is even more so a minimal necessity of civilized life. Doc. Ent. 25 at 14-15.

In his statement of disputed factual issues, he alleges that there has been a "failure to provide humane conditions of confinement" and a failure to discharge "their duty to ensure that [he] received adequate food, water, clothing, shelter and medical care[.]" Plaintiff claims this evidences defendants' deliberate indifference via a wanton infliction of pain and/or injury upon him. Doc. Ent. 28 at 2 ¶ 1. Plaintiff contends that deliberate indifference can be shown. Doc. Ent. 28 at 3 ¶ 3. Plaintiff argues that he has shown deliberate indifference by the fact that he "is

being forced to continually drink toxic/bacterial/contaminated water, causing [him] to [experience] excruciating daily pain, [compounded] by daily vomiting [and] risk of serious harm[.]" Plaintiff also argues that he is "being forced to be housed at [SLF], where the water is contaminated."  Doc. Ent. 28 at 4 ¶ 6.

**d.**      As an initial matter, plaintiff claims that defendants refuse to transfer him out of malice for filing the instant lawsuit.  Doc. Ent. 25 at 3.  *See also* Doc. Ent. 27 at 13 ¶ 5.  Setting aside the conclusory nature of this statement, the Court notes that plaintiff was transferred from SLF on or about August 21, 2007, Doc. Ent. 32, and is currently incarcerated at LCF.

Furthermore, to the extent plaintiff characterizes his complaint as involving the denial of medical care, Doc. Ent. 26 at 5, the Court should agree with defendants that "[p]laintiff acknowledges prompt diagnosis and treatment[,]" Doc. Ent. 16 at 11.  Plaintiff's June 21, 2006, complaint culminated in a test for H Pylori by the end of the month.  Doc. Ent. 3 at 2, 25. Furthermore, plaintiff's February 26, 2007, visit to the DLW Health Center culminated in his April 23, 2007, EGD with biopsy.  Doc. Ent. 29-3 at 39-42.

Moving to the objective prong, defendants note the United States Supreme Court's consideration of whether the practice at hand "[led] to deprivations of essential food, medical care, or sanitation[,]" or "[created] other conditions intolerable for prison confinement."  *Rhodes*, 452 U.S. at 348; Doc. Ent. 16 at 10.  This report assumes *arguendo* that confinement at a facility whose water supply contains a certain level of p-CBSA meets the objective prong.  *Henderson v. Huibregtse*, No. 05-C-157-C, 2005 WL 955349, *3 (W. D. Wis. Apr. 25, 2005) (assuming that plaintiff's conditions met the objective component.).

However, the Court should agree with defendants that "the facts fail to demonstrate that [they] exhibited deliberate indifference to a threat of harm to Plaintiff's health[.]" Doc. Ent. 16 at 9. In particular, defendants note that on or about November 16, 2001, Warden's Forum members were provided with a copy of the "H. Pylori and Peptic Ulcer packet." Doc. Ent. 16-4, Rsp. #5; Doc. Ent. 16-3 ¶ 4.[15] Defendants also note that the October 10, 2005, memorandum, which explained that "the concentration of p-CBSA found in the water supply [was] far below the concentration believed to cause adverse effects on humans[,]" and "[t]he DEQ [was] also continuing to collect and evaluate information to assess health risks and to determine the best operational practices for the St. Louis water system[,]" was distributed to staff and prisoners at SLF, STF (Mid-Michigan Correctional Facility) and SPR (Pine River Correctional Facility). Doc. Ent. 16 at 9-10; Doc. Ent. 16-3 ¶ 3 (Lafler Affid.); Doc. Ent. 16-5 at 2. This distribution discredits plaintiff's allegation "that several high ranking prison officials have worked in concert (with full knowledge) to suppress the fact that the water being pumped into St. Louis prison facilit[ies] is toxic/bacteria/contaminated to the point of being poisoned water, which has ultimately infected plaintiff with the disease of H-Pylori." Doc. Ent. 26 at 5.

This conclusion is consistent with the decisions of other courts that have considered claims like plaintiff's. In *Griffin v. Suthers*, 156 Fed.Appx. 66 (10th Cir. 2005), plaintiff brought an Eighth Amendment claim based in part on being subjected to drinking water contaminated

---

[15]This report and recommendation makes no scientific determinations about the method(s) of contracting H Pylori. For example, a research product posted on the EPA's website notes that "[f]indings based on the autoradiographic approach give strong evidence supporting the hypothesis that there is a waterborne route of infection for H. pylori. The possibility that H. pylori may persist in water in a metabolically active stage but not actively growing and dividing is intriguing and relevant to public health concerns." *See* www.epa.gov/GED/publica/c2121.htm.

with H Pylori and the failure to provide adequate medical treatment for related conditions. *Griffin*, 156 Fed.Appx. at 68. The Court concluded that plaintiff "did not present in the district court any disputed facts or identify any undiscovered evidence materially relevant to the subjective component of the deliberate indifference test." *Griffin*, 156 Fed.Appx. at 70. The Court stated that, "[e]ven if the LCF defendants should have drawn an inference from these facts that a substantial risk of serious harm might exist in the drinking water, Griffin has offered nothing to show that they drew such an inference and disregarded it, as required for an Eighth Amendment claim of deliberate indifference[.]" *Griffin*, 156 Fed.Appx. at 71. The Court also stated that "none of the evidence Griffin points to creates a genuine issue of material fact concerning whether any of the LCF defendants were deliberately indifferent either to a substantial risk of serious harm contained in the LCF water supply or to his medical needs." *Id.*

Even attributing knowledge of the contaminated water to defendants, the October 10, 2005, memorandum discredit's plaintiff's allegation that defendants have full knowledge of SLF's poisonous water, Doc. Ent. 26 at 11 ¶ 7, because it does not support the conclusion that defendants knew of certain danger to plaintiff's health. As the letter stated, "the concentration of p-CBSA found in the water supply [was] far below the concentration believed to cause adverse effects on humans." Doc. Ent. 16-5 at 2. *See also Nash v. Detella*, No. 00 C 2784, *5 (N. D. Ill. Oct. 2, 2001) ("there is no evidence that Stateville inmates face any greater risk than the general population in the surrounding geographical area, indeed much of the Midwest.").

In *Henderson*, plaintiff alleged an Eighth Amendment claim based upon the conditions of confinement. *Henderson*, 2005 WL 955349 at *3-*4. Plaintiff asserted that "he ha[d] contracted H-pylori because of the proximity of the head of his bed to a toilet that has been cleaned with

unsanitary water[.]" *Henderson*, 2005 WL 955349 at *3. However, with respect to the subjective component, the court noted: "Petitioner alleges that respondents Frank [Secretary of Department of Corrections] and Casperson [Administrator of the department's Division of Adult Institutions] knew that Helicobacteria-pylori is a communicable bacteria that can cause stomach cancer and that the bacteria could be spread through polluted water. However, petitioner does not allege that either of these respondents knew or had reason to suspect that the bacteria exists in the facility's water supply." *Henderson*, 2005 WL 955349 at *4. The Court also stated: "Petitioner's allegations that respondents Frank, Endicott and Huibregtse adopted and enforced a policy pursuant to which petitioner was forced to sleep with his head near an unsanitary toilet does not suggest deliberate indifference. Again, these allegations are insufficient to suggest that these respondents were aware of the "outbreak" of Helicobacteria-pylori bacteria at the prison or that inmates could become infected by sleeping with their head near a toilet." *Id*.

Here, plaintiff has alleged that defendants have full knowledge of SLF's poisonous water, he is forced to ingest it on a daily basis; as a result he suffers irreparable bodily injury/harm; and defendants absolutely refuse to transfer him, even though "it is well-documented that plaintiff has been infected with the disease of H-Pylori as a result and continually vomits on a daily basis as a result." Doc. Ent. 26 at 11 ¶ 7. To the extent plaintiff's Eighth Amendment claims of deliberate indifference are based upon the forced ingestion of SLF's water and food due to the failure to transfer him, the September 22, 2006, Step I grievance response acknowledges plaintiff's request for transfer and notes that the medical kite response stated "there was no need for a medical transfer." Doc. Ent. 3 at 30.

In *Robinson v. Edwards*, No. 04 Civ. 2804(PAC), 2006 WL 1889900 (S.D.N.Y. July 5, 2006), plaintiff alleged that "OCF officials knew and failed to address a problem with contaminated water, from which he contracted the Heliobacter Pylori ("H.pylori") bacterium." *Robinson*, 2006 WL 1889900 at *1. He also alleged that "subsequent to his infection, defendants failed to provide him with proper medical treatment." *Id.* With respect to water quality, Robinson specifically alleged that "Defendants failed to address this problem by neither conducting more frequent testing nor by installing water filtration[,]" and "OCF experienced an 'outbreak' of H. pylori infection in 2000[.]" *Id.* at *9. The court stated:

> . . . the fact that from 2001 to 2004, out of an average of 500 inmates incarcerated at OCF on an annual basis, between two and twelve prisoners tested positive for the bacterium does not indicate that a health problem-let alone an outbreak-existed at OCF, or that the bacterium was transmitted through OCF water. . . .

> Robinson does not submit any evidence (and, in fact, cannot submit because none exists) to rebut Defendants' contention that multiple sources of transmission exist for the H. pylori bacterium and that-given the state of scientific knowledge to date-the source of transmission for any given infection is practically unknowable. . . .

> Robinson cannot show-and certainly has not presented any evidence-that any of the Defendants were deliberately indifferent to concerns related to the OCF water system. Defendants have submitted affidavits indicating that OCF has procedures in place to monitor the quality of the OCF water through daily, monthly, and periodic testing of various substances to ensure its safety and Robinson has not presented any evidence to rebut this evidence. . . .

> Robinson has not submitted any evidence that Defendants Sarreck [prison facility health services director] or Miller [prison nurse administrator] knew about H. pylori contamination of water prior to or following Superintendent Edward's involvement and then failed to properly inform supervisors.

*Id.* at *9. Therefore, the court concluded, "Defendants were not deliberately indifferent to the possibility of the transmission of H. pylori through facility water." *Id.*

In *Cherry v. Edwards*, No. 01 Civ. 7886(FM), 2005 WL 107095 (S.D.N.Y. Jan. 18, 2005), plaintiffs claimed that "they became infected with Heliobacter Pylori ("H.pylori") bacteria when they were exposed to contaminated drinking water at OCF, and that they subsequently received inadequate medical treatment for this condition." *Cherry*, 2005 WL 107095 at *1. With respect to complaints about the prison's water supply, the court assumed that H Pylori could be transmitted by water. *Id.* As to the claim of deliberate indifference based upon the prison's water quality, the court stated that "the evidence adduced by the Plaintiffs is plainly insufficient to show that there was a greater than normal incidence of infection at OCF and, hence, some reason to believe that the water distribution system was fostering its spread[,]" and "[n]or can the plaintiffs show that any of the Defendants were deliberately indifferent to problems with the water system at OCF since Superintendent Edwards brought in tanker water when organisms were discovered in the water, kept the tanks trucks at OCF until the water was found to be potable, and ensured that procedures were in place to monitor the quality of the OCF water." *Id.* at *8. The court concluded, "[d]efendants are entitled to summary judgment insofar as the Plaintiffs contend that defendants Edwards [former prison superintendent], Goord [Commissioner of the New York State Department of Correctional Services] and Eagen [Director of the DOCS Inmate Grievance Program] were deliberately indifferent to the prospect that H. pylori bacteria were being spread throughout the OCF inmate population through the OCF water supply." *Id.* at * 9.

Even assuming that plaintiff contracted H Pylori while in MDOC's custody, defendants note that "[t]ransmission modes for H-Pylori, a common bacterium, are still under study; and inmates are updated with information as that information becomes available to prison officials."

Doc. Ent. 16 at 11. This is consistent with the statement that "multiple sources of transmission exist for the H. pylori bacterium[.]" *Robinson*, 2006 WL 1889900 at *9. *See also Cherry*, 2005 WL 107095 at *8.

Furthermore, plaintiff claims he is "one inmate among many who are housed at [SLF] [and] have become infected, and when compared the percentage of inmates who have contracte[d] the disease of H-Pylori at [SLF, STF, and SPR] far [outweighs] the percentage of other inmates at all other prisons within Michigan put together." Doc. Ent. 28 at 4 ¶ 7. Although the Court does not know the average number of inmates incarcerated at the St. Louis prison facilities, this report assumes that plaintiff's diagnosis, together with the lab results and affidavit of another prisoner who tested positive for H PYLORI IGG in October 2006 (Doc. Ent. 29-3 at 4-12), would not constitute an outbreak raising a "red flag" about the water distribution system. *Robinson*, 2006 WL 1889900 at *9, *Henderson*, 2005 WL 955349 at *4, *Cherry*, 2005 WL 107095 at *8.

**e.** Additionally, in *Robinson* and in *Cherry*, the court recognized the prison's procedures to monitor the quality of its water. *Robinson*, 2006 WL 1889900 at *9; *Cherry*, 2005 WL 107095 at *8. Also, in *Cherry*, tank trucks were kept at the prisoner until the water was determined potable. *Cherry*, 2005 WL 107095 at *8. Here, even attributing knowledge of the contaminated water to defendants, the October 10, 2005, letter states the DEQ was monitoring health risks.

Of course, this somewhat contradicts plaintiff's claim that the water is never tested for H-Pylori. Doc. Ent. 25 at 6 ¶ 7. In support of this statement, plaintiff provides a 2004 Water Quality Data report and several DEQ Drinking Water Laboratory Official Laboratory Reports on

analysis for coliform organisms, dated 2005-2007, each of which states "not detected".  Doc. Ent. 29-3 at 15-28.

Even if the water is not tested for H Pylori, the prison officials, who are not in the business of testing water for its safety, are entitled to rely upon experts in that area.  As the Seventh Circuit has noted:

> Many Americans live under conditions of exposure to various contaminants.  The Eighth Amendment does not require prisons to provide prisoners with more salubrious air, healthier food, or clear water than are enjoyed by substantial numbers of free Americans.  It would be inconsistent with this principle to impose upon prisons in the name of the Constitution a duty to take remedial measures against pollution or other contamination that the agencies responsible for the control of these hazards do not think require remedial measures.  If the environmental authorities think there's no reason to do anything about a contaminant because its concentration is less than half the maximum in a proposed revision of the existing standards, prison officials cannot be faulted for not thinking it necessary for them to do anything either.  They can defer to the superior expertise of those authorities.

*Carroll v. DeTella*, 255 F.3d 470, 472-473 (7th Cir. 2001) (internal citations omitted).  *See also Nash v. Detella*, No. 00 C 2784, *7 (N. D. Ill. Oct. 2, 2001) ("deliberate indifference cannot be attributed to the defendants since even the state and federal environmental protection agencies-the government bureaucracies that oversee such health concerns-required no action.").  As another court has stated:

> Even though State defendants knew of the inmates' concern about the water conditions, there is nothing to suggest that State defendants knew that the water posed serious health risks.  To the contrary, maintenance at HRYCI, the City of Wilmington, and Delaware Health and Social Services all informed State defendants that the water was not contaminated.  In light of these findings, and absence of evidence indicating otherwise, it cannot be said that State defendants had the requisite awareness for a finding of deliberate indifference.

*Brown v. Williams*, 399 F.Supp.2d 558, 566-567 (D. Del. 2005).

Unlike the 2004 Water Quality Data, 2005 Water Quality Data, accessible via the city's website ([www.stlouismi.com](www.stlouismi.com)), indicates that the unregulated contaminant of p-CBSA was detected and that its typical source is the "[b]y-product of DDT manufacturing: According to USEPA".  The footnotes explain that an "[u]nregulated contaminants are those for which EPA has not established drinking water standards[;]" "[t]he City has removed well #4 from production[,]" and "[w]ell # 1 & 7 are used MINIMALLY[;]" and "[t]he City is currently researching treatment options or replacement sources of water to permanently eliminate the effected wells."  The aforementioned October 20, 2005, letter from the DEQ to the City of St. Louis recognizes that "the presence of pCBSA has indicated the potential movement of contamination from the Velsicol Chemical plant site[,]" but recommends to the City that it investigate alternative water sources.

Furthermore, an April 11, 2007, news release posted on the City's website under "Departments and Services" and "Water and Wastewater", announces the filing of the lawsuit against Velsicol and others.  The release, titled "City of St. Louis Moves to Protect Drinking Water", quotes Mayor Kubin as stating, "[t]he EPA has assured us that our water is currently safe to drink, but it will cost many millions of dollars to make sure it stays that way[,]" and "[t]his lawsuit is a proactive measure designed to ensure that the residents of St. Louis will always have top quality drinking water."  The release further states that "[a]fter discovery of p-CBSA in the city's water supply in 2005, the Michigan Department of Environmental Quality advised the city to investigate alternative sources. Based on this advice, the city has taken two wells offline that show higher concentrations of p-CSBA and has ramped up testing in all of its wells."

**3.     Plaintiff's claims are governed by the Eighth Amendment and not substantive due process under the Fourteenth Amendment.**

**a.**     In both his response and his statement of disputed factual issues, plaintiff claims his complaint also alleges a violation of his Fourteenth Amendment right to preserve his life.  Doc. Ent. 25 at 2, 8, 17; Doc. Ent. 28 at 2 ¶ 1.  Plaintiff claims that defendants have provided him with toxic/bacterial/contaminated water, resulting in his infection with H Pylori, and that they have violated their duty to protect him.  Doc. Ent. 25 at 2-3.

Plaintiff claims that he "is entitled to basic human needs such as untainted water and food prepared by untainted water where prison officials have a duty to supply these things due to plaintiff who is a prisoner being institutionalized against his will."  Doc. Ent. 25 at 11.  Citing *McQueen v. Beecher Community Schools*, 433 F.3d 460, 463-464 (6th Cir. 2006) and its reliance on *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189 (1989), plaintiff contends that defendants have failed to provide him with the most basic human need of uncontaminated water and are depriving him of his constitutional rights by doing otherwise. Plaintiff claims the constitutional violation is shown by the fact that "he has been infected with the disease of H-Pylori (which increases the risk to stomach cancer by three to six times) from drinking the tainted water and eating food prepared by tainted water[.]" Doc. Ent. 25 at 12.[16]

**b.**     "As a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."  *DeShaney*, 489 U.S. at 197. "[W]hen the State takes a person into its custody and holds him there against his will, the

---

[16]In support of this statement, plaintiff offers information on the treatment of gastric and duodenal ulcers.  The source of the text is not clear; however, it states that "[i]nfected persons are three to six times more likely to develop stomach cancer."  Doc. Ent. 25 at 6 ¶ 7; Doc. Ent. 29-3 at 14 (Appendix G).

Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199-200. "[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs - e.g., food, clothing, shelter, medical care and reasonable safety - it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *Id.* at 200. "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf - through incarceration, institutionalization, or other similar restraint of personal liberty - which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *Id.* "[T]he Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation." *Id.* at 202.

**c.**     Plaintiff claims that defendants have violated the state-created danger doctrine. Doc. Ent. 25 at 3. However, neither the custody exception nor the state-created danger exception to the general rule that "[i]t is not a constitutional violation for a state actor to render incompetent medical assistance or fail to rescue those in need[,]" *Jackson v. Schultz*, 429 F.3d 586, 590-592 (6ᵗʰ Cir. 2005) (citing *DeShaney*, 489 U.S. at 199-201),[17] should be applied to this case. This

---

[17]"Decedent's clearly established constitutional rights were not violated because the decedent was never in custody and the EMTs did nothing to increase the risk of harm to decedent." *Jackson*, 429 F.3d at 588.

Fourteenth Amendment analysis regarding defendants' duties to care for plaintiff *appears* to be applicable to the case at bar, because plaintiff was in custody at the time he tested positive for H Pylori.

More pointedly, "[t]he Supreme Court has on numerous occasions held that an inmate's treatment by prison authorities is rarely subject to judicial oversight under the Due Process Clause." *Meriwether v. Faulkner*, 821 F.2d 408, 414 (7th Cir. 1987). "[C]hanges in the conditions of confinement having a substantial adverse impact on the prisoner are not alone sufficient to invoke the protections of the Due Process Clause '[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentenced imposed upon him.'" *Vitek v. Jones*, 445 U.S. 480, 493 (1980). In other words, are the "consequences visited on the prisoner . . . qualitatively different from the punishment characteristically suffered by a person convicted of crime." *Vitek*, 445 U.S. at 493.

The Supreme Court has also stated that "the Eighth Amendment . . . serves as the primary source of substantive protection to convicted prisoners in cases such as this one, where the deliberate use of force is challenged as excessive and justified." *Whitley v. Albers*, 475 U.S. 312, 327 (1986). "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). "Any protection that 'substantive due process' affords convicted prisoners against excessive force is . . . at best redundant of that provided by the Eighth Amendment." *Graham*, 490 U.S. at 395 n.10. *See also Husband v. Fair*, Civ. A. No. 86-1276-WAG, 1994 WL 548066,

*6 (D. Mass. June 23, 1994) ("there is no reason why this rule should not also apply to Eighth Amendment claims alleging a failure to provide medical attention[.]").

**4.      Plaintiff's claims are based upon the doctrine of respondeat superior, and there is no showing that defendants are personally involved as defined by 42 U.S.C. § 1983.**

**a.**      Plaintiff's complaint alleges that a "governmental agency or supervisor may be held liable for intentional deliberate indifference under the doctrine of [respondeat] superior."  Doc. Ent. 1 at 8 ¶ 15.  Plaintiff sues each of the defendants in their official and individual capacities under the theory of *respondeat superior*.  Doc. Ent. 1 at 8 ¶ 19.

Defendants argue that "[c]laims based on *respondeat superior* are not cognizable under 42 USC § 1983."  Doc. Ent. 16 at 1, 11.  Specifically, they argue that "[d]efendants cannot be held liable on a *respondeat superior* theory under 42 USC § 1983."  Doc. Ent. 9.  Defendants argue that they "are not subject to damages under that statute absent a showing that each defendant encouraged a specific incident of misconduct on the part of an offending subordinate or in some other way directly participated in it."  Doc. Ent. 16 at 11.  Defendants argue that "[t]he evidence in this case fails to demonstrate the defendants' participation in or acquiescence to a subordinate's wrongful conduct or their failure to appropriately discharge their supervisory duties."  Doc. Ent. 16 at 12.

**b.**      Liability in a § 1983 action cannot be based on a theory of *respondeat superior*.  *See Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691 (1978).  "[T]he mere right to control without any control or direction having been exercised and without any failure to supervise is not enough to support § 1983 liability."  *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694 n.58 (1978), citing *Rizzo v. Goode*, 423 U.S. 362, 370-371 (1976).

As the Sixth Circuit has stated:

"Section 1983 liability will not be imposed solely upon the basis of respondeat superior. There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. *At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.*"

*Taylor v. Michigan Dep't of Corrections*, 69 F.3d 76, 81 (6th Cir. 1995) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984) (emphasis added)) (emphasis by *Taylor* court); *see also*, *Monell*, 436 U.S. at 693-95; *Birrell v. Brown*, 867 F.2d 956, 959 (6th Cir. 1989); *Dunn v. Tennessee*, 697 F.2d 121, 128 (6th Cir. 1982).

The following three elements are necessary to establish supervisor liability under § 1983:

(1)...the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2)...the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3)...there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994), citing cases including *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

Furthermore, an allegation that a supervisor was aware of an actionable wrong committed by a subordinate and failed to take corrective action "is insufficient to impose liability on supervisory personnel under § 1983." *Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988). As the *Haydon* court stated: "A supervisory official's failure to control, or train the offending individual is not actionable, unless the supervisor 'either encouraged the specific incident or in some other way directly participated in it.'" *Haydon*, 853 F.2d at 429 (quoting *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir. 1982)).

**c.**     Plaintiff claims he can show that defendant(s) "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officials." Doc. Ent. 28 at 2 ¶ 2. He claims defendants are subjecting him to consumption of "known contaminated water and the food that's prepared in this toxic/bacteria water here at [SLF][.]" Doc. Ent. 25 at 18. Plaintiff alleges that defendants knew of and encouraged disregard of "several inmate complaints and further implicitly authorized, approved, or knowingly acquiesced, in regards to the tainted water that plaintiff was going to be subject to while being housed at [SLF], therefore, deliberately denying plaintiff of his constitutional right, and their duty to protect plaintiff while incarcerated against his will to the basic human need of untainted water." He claims that "many, many grievances, complaints, and civil litigation were filed on these same four (4) defendants prior to plaintiff's arrival at [SLF][,] clearly showing [be]forehand knowledge, and deliberate disregard, of serious hazardous risk to plaintiff." Therefore, he claims, he has surpassed a claim based solely upon respondeat superior liability. Doc. Ent. 25 at 19. Plaintiff claims that defendants "have with specific knowledge beforehand, either directly participated in the unconstitutional conduct of the offending subordinate by direct participation in it" by their implicit authorization, approval or knowing acquiescence. Doc. Ent. 25 at 22.

**d.**     The Court should agree with defendants that there is no showing of their personal involvement. Doc. Ent. 16 at 9. Perhaps most persuasive is defendants' statement that none of them "are responsible for content of the prison water supply, and the appropriate authorities have investigated and continue to investigate the water supply." Doc. Ent. 16 at 9.

In *Robinson v. Edwards*, No. 04 Civ. 2804(PAC), 2006 WL 1889900 (S.D.N.Y. July 5, 2006), the court concluded that the prison superintendent, the commissioner of the state

department of correctional services and the director of the department's inmate grievance program were entitled to summary judgment on the claim of supervisory liability. *Robinson*, 2006 WL 1889900 at *8. In so doing, the court noted that defendants did not have direct dealings or personal involvement with plaintiff; plaintiff did not allege that "any of these Defendants learned of any § 1983 violations through a report or appeal or that any such violations resulted from a policy or practice instituted by the Defendants[;]" and "no basis exist[ed] to maintain that any of these Defendants were grossly negligent in their supervision of subordinates." *Id.* Specifically, the court noted that "[d]efendants maintain policies and procedures for ensuring that correctional facilities contain water suitable for human consumption and, when concerns arose regarding OCF water quality and safety in 1998, Defendant prison officials took immediate steps to provide potable water and have the facility water tested." *Id.* Here, there is no indication that defendants are acting in contravention of direction from state and/or federal water authorities.

In *Lozano v. Corrections Corp. of America*, 23 Fed.Appx. 348 (6th Cir. 2001), plaintiff had been infected with H Pylori and alleged that the prison's water was contaminated. *Lozano*, 23 Fed.Appx. at 349-350. Plaintiff asserted that "CCA's deliberate indifference in failing to acknowledge the source of his illness amount[ed] to cruel and unusual punishment." *Id.* at 350. The Court concluded that plaintiff had not made allegations as described in *Taylor*, 69 F.3d at 80-81, and stated that "[w]hile the standard for dismissal for failure to state a claim is liberal, more than bare assertions of legal conclusions are ordinarily required." *Lozano*, 23 Fed.Appx. at 350.

Plaintiff's claim of personal involvement, as set forth above, is conclusory in nature. As previously noted, conclusory assertions are insufficient for purposes of surviving summary judgment. *Daniel v. Cox*, No. 96-5283, 1997 WL 234615, *2 (6th Cir. May 6, 1997) (unpublished). The assessment of plaintiff's personal involvement claims as conclusory is consistent with his apparent conclusion that defendants have "full knowledge" of the water's danger on the basis that they are all prison officials. Doc. Ent. 26 at 7.[18]

In his motion for injunctive relief, plaintiff claims that defendants Caruso, Straub and Lafler are "fully aware of the poisonous water[;]" Rivard is responsible for overseeing transfers; and each defendant refuses to transfer him despite personally knowing of his daily suffering. Doc. Ent. 27 at 13 ¶¶ 9-12. He further claims that each of the four defendants is authorized to order plaintiff's transfer to another prisoner "instead of subjecting [him] to excruciating daily pain and suffering." Doc. Ent. 27 at 14 ¶ 13. However, these allegations constitute a failure to act. Where defendants' "only roles . . . involve the denial of administrative grievances or the failure to act . . . they cannot be liable under § 1983." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[L]iability under § 1983 must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act.'" *Shehee*, 199 F.3d at 300 (citing *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir.1998)).

Furthermore, to the extent plaintiff asserts that his claim is based on more than respondeat superior liability due to defendants' active decision not to transfer him, this report has already concluded that an underlying Eighth Amendment violation has not been shown. "When

_____

[18]In his motion to appoint counsel, plaintiff acknowledged the "complex legal issues of determining which defendants were sufficiently personally involved in the constitutional violations[.]" Doc. Ent. 26 at 8.

the plaintiff alleges supervisory liability based on failure to train and supervise, or based on creation of a policy or custom, the plaintiff must show that the failure to train and supervise or the policy or custom itself amounts to deliberate indifference on the part of the supervisory officials." *Ronayne v. Ficano*, No. 98-1135, 1999 WL 183479 (6th Cir. Mar. 15, 1999) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "[I]t is well established that for municipal or supervisory liability for failure to train or supervise to attach, there first must be an underlying violation of plaintiff's constitutional rights." *London v. Hamilton*, No. CA 3:95CV347-MCK, 1996 WL 942865, *8 (W.D.N.C. 1996) (citing *Monell* and *City of Canton*).

Accordingly, the Court should conclude that plaintiff's claims are based upon the doctrine of respondeat superior, and there is no showing that defendants are personally involved pursuant to 42 U.S.C. § 1983.

**5.      Therefore, the Court need not consider whether plaintiff's rights were clearly established or whether defendants' conduct was objectively reasonable.**

**a.**      Plaintiff also alleges "violation of a Ministerial Duty and Discretionary Function[.]" Doc. Ent. 1 at 9 ¶ 21.  Defendants argue that "[i]ndividual capacity claims are barred by qualified immunity since the doctrine bars an action where a plaintiff has not pled and demonstrated a violation of clearly established federal law."  Doc. Ent. 16 at 2.  Defendants claim that there are "no facts sufficient to avoid qualified immunity."  Doc. Ent. 16 at 9.

**b.**      The defense of qualified  immunity should only be addressed after determining whether plaintiff has stated a constitutional claim upon which relief can be granted.  "[T]he better approach is to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was

clearly established at the time of the events in question." *County of Sacramento v. Lewis*, 523 U.S. 833, 842 n.5 (1998), citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991).

The Supreme Court has stated that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citing *Procunier v. Navarette*, 434 U.S. 555, 565 (1978) and *Wood v. Strickland,* 420 U.S. 308, 322 (1975)) (footnote omitted.) "[Q]ualified immunity would be defeated if an official '*knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* if he took action *with the malicious intention* to cause a deprivation of constitutional rights or other injury[.]'" *Harlow*, 457 U.S. at 815 (citing *Wood*, 420 U.S. at 322).

The doctrine of qualified immunity is intended to protect public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow*, 457 U.S. at 806. The Sixth Circuit has stated that the qualified immunity inquiry requires a three-step analysis: (1) has plaintiff alleged a violation of a constitutional right?; (2) if so, was that right clearly established at the time of the alleged conduct?; and (3) if the right was clearly established, has plaintiff alleged and sufficiently supported that the official actions were objectively unreasonable in light of this clearly established right? *See Dickerson v. McClellan*, 101 F.3d 1151, 1157-58 (6th Cir. 1996). Ultimately, "the burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity." *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000) (citing *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

**c.**     Plaintiff argues that he has alleged a violation of federal law.  Plaintiff claims there have been "conditions of confinement . . . constitut[ing] cruel and unusual punishment because they resulted in unquestioned and serious deprivations of basic human needs . . . [which] deprive inmates of the minimal civilized measure of life's necessities."  *Rhodes*, 452 U.S. at 347; *J.P. v. Taft*, 439 F.Supp.2d 793, 810 (S. D. Ohio 2006); Doc. Ent. 28 at 3 ¶ 5.  Citing *Bellamy v. Bradley*, 729 F.2d 416, 419 (6th Cir. 1984), plaintiff claims this right has been clearly established for more than twenty (20) years.  Doc. Ent. 28 at 3 ¶ 5.

Plaintiff claims that his allegations and the facts "clearly set forth [defendants' violation of] plaintiff's constitutional rights under both the Eighth Amendment (cruel and unusual punishment) and Fourteenth Amendment (due process right to be free to preserve one's life clause)[.]" Doc. Ent. 25 at 17.  Plaintiff claims these rights are clearly established.  Doc. Ent. 25 at 2.  Citing *Bellamy* and *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998),[19] plaintiff claims the duty to protect is clearly established.  Doc. Ent. 25 at 16-17.

**d.**     Defendants' qualified immunity argument is, at its heart, based upon plaintiff's failure to satisfy the first prong of a qualified immunity analysis - the failure to allege violation of a constitutional right.  They maintain that "[t]he claims are defective as a matter of law since there is no showing of deliberate indifference to a serious medical need and no showing of the defendants' personal involvement.  Therefore, there are no facts . . . sufficient to avoid qualified immunity."  Doc. Ent. 16 at 8, 9, 12.

---

[19]"[W]hile the state generally does not shoulder an affirmative duty to protect its citizens from private acts of violence, it may not cause or greatly increase the risk of harm to its citizens without due process of law through its own affirmative acts."  *Kallstrom*, 136 F.3d at 1066.

If the Court agrees with my foregoing conclusions that plaintiff's Eighth Amendment and Fourteenth Amendment claims do not survive summary judgment, then the Court need not consider whether plaintiff's rights were clearly established or whether defendants' conduct was objectively reasonable. *County of Sacramento*, 523 U.S. at 842 n.5; *Dickerson*, 101 F.3d at 1157-1158.

## III.  NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231, American Federation of Teachers*, AFL-CIO, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 2/20/08

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on February 20, 2008.

s/Eddrey Butts
Case Manager